HARRY E. MacCONAUGHEY, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

JOEL W. KAUFMANN, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

MILDRED B. KAUFMANN, PETITIONER, v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 92052, 95082, 95083. Promulgated February 16, 1940.

*Walter C. Fox, Jr., Esq.*, and *Robert B. Gaylord, Esq.*, for the petitioner in Docket No. 92052.

*Walter C. Fox, Jr., Esq., Monte A. Dernham, Esq.*, and *Donald M. Scott, Esq.*, for the petitioners in Docket Nos. 95082 and 95083.

*Arthur L. Murray, Esq.*, and *Harry R. Horrow, Esq.*, for the respondent.

## OPINION.

DISNEY: These proceedings, duly consolidated, involve deficiencies in income tax as follows:

|  | Docket No. | Year | Amount |
|---|---|---|---|
| Harry E. MacConaughey | 92052 | 1934 | $498.59 |
| Joel W. Kaufmann | 95082 | 1936 | 295.20 |
| Mildred B. Kaufmann | 95083 | 1936 | 380.59 |

All facts have been stipulated, by a general stipulation covering facts common to all cases and a supplemental stipulation in each proceeding as to facts not common to all. The facts so stipulated are found as facts by us, and will be set forth herein only so far as is necessary for disposition of the issue presented. The only issue left for our consideration is whether the "Coos Bay Lumber Company Syndicate" was an association taxable as a corporation.

The facts involved may be epitomized as follows: The Coos Bay Lumber Co. (hereinafter called the company) was for many years prior to 1928, and has ever since been, a corporation engaged in the lumber business. In addition to operating properties, such as lumber mills, it owned nonoperating timber lands. Through a reorganization which had taken place in 1927, the holders of the company's bonds exchanged them for 63,757 shares of first preferred stock and 63,757 shares of no par value common stock, this being all of the common

stock and all of the first preferred stock, and all was placed in a voting trust with power in the trustees to sell the same for the benefit of the beneficiaries, the former bondholders. The general creditors as a part of the reorganization received 10,000 shares of second preferred stock. On July 10, 1928, the company made a contract to sell for $2,000,000 a part of its nonoperating timber lands. The proceeds of that sale were received prior to April 12, 1929. In 1928 an investment banking house, after investigating the financial standing, business, and operations of the company, decided that with the proceeds of sale of all or a substantial part of the remaining nonoperating timber lands the second preferred stock and a substantial portion of the first preferred stock could be retired, that the company's earnings would pay 7 percent on the remaining first preferred stock, and that any preferred remaining, and the common, could be sold to sawmill operators in the southern states or otherwise disposed of. The investment bankers believed that, because of depletion of timber in the southern states, such sawmill operators desired to commence operations in the West.

On October 5, 1928, the investment banking house, on its own behalf, made a contract to buy, and on November 1, 1928, did buy, from the voting trustees all of the first preferred and all of the common stock of the company, for $6,375,700 cash. On October 22, 1928, the investment banking house formed a syndicate to purchase from itself all of the first preferred and three-fourths of the common stock for an aggregate price of $6,375,700, retaining one-fourth of the common stock as compensation for services as syndicate manager. All of the stock was to be deposited with the Bank of California, National Association, as depositary. The syndicate was to be divided into 63,757 units, each unit to be sold for $100, plus interest of 7 percent per annum from October 1, 1928, until payment. All units were disposed of and each member signed and delivered to the syndicate manager a counterpart of the agreement forming the syndicate. The manager also signed a copy thereof. The purchase price of the units, $6,375,700, plus interest was paid to the investment banking house by itself as syndicate manager. There were 894 original members of the syndicate. Settlement for all units was made in cash by payment to the depositary, the Bank of California, National Association, for the account of the investment banking house as syndicate manager. The bank issued deposit certificates to each member acknowledging receipt of such payment.

The syndicate agreement provides, so far as material, that the syndicate manager, Peirce, Fair & Co., is forming a syndicate of which it will be manager and in which it will participate to purchase the first preferred and common stock of the company; that interests in the syndicate will be in $100 units; that "The purpose of this Syndi-

cate is to acquire the stock above mentioned and to market or otherwise dispose of all or a part thereof"; that in material part the terms of the syndicate are: That no interest shall be transferable at any time except with the express written consent of the manager, which may be given or withheld at the manager's option in each case, provided that the manager hereby consents to pledge by any member of his interest for the purpose of borrowing money on the security thereof for his own use; that the manager reserves the right in its absolute discretion to determine who shall become members and the number of units to which anyone shall be permitted to subscribe; upon making payment, each member shall be entitled to a receipt; but nothing in the agreement or otherwise shall constitute the members partners with, or agents for, the manager; that except as otherwise expressly provided, the agreement shall bind and inure to the benefit of the several members, their heirs, executors, administrators and assigns; that the syndicate shall expire November 1, 1932, provided that the manager may, in its discretion, extend the term not to exceed four years, and may terminate the same at any time upon ten days' written notice to the members; that within thirty days after the termination of the syndicate, the manager shall make final distribution of the net assets and profits of the syndicate to the members pro rata; and that the manager's apportionment and determination of profits, losses and expenses of the syndicate and its written statement of the results of the syndicate shall be conclusive upon the members.

The syndicate agreement further provides:

The Manager shall have the sole direction and management in all respects of transactions and business of the Syndicate. The members irrevocably grant to the Manager full power and authority, for account of the Syndicate, to do any and all acts and enter into and execute any and all agreements or other instruments necessary, proper or expedient, in the judgment of the Manager, to carry out and perform this agreement, including the right to sell at public or private sale from time to time, in the discretion of the Manager, any and all of the securities owned by the Syndicate, or to exchange any of such securities for other securities, and generally, as such Manager, to transact the business of the Syndicate in such manner as in its discretion it may deem for the best interests of the Syndicate. * * * The Manager shall have the right, in its own name or otherwise, but for the account of the Syndicate, to do all such things and take all such action as may be necessary in its discretion to sell, merge or consolidate the properties of the Coos Bay Lumber Company with those of any other person, firm or corporation or to reorganize, recapitalize or refinance said corporation, and for such purpose the Manager shall have the right to exchange any or all securities owned by the Syndicate for securities of any other corporation into which it may be merged or consolidated or to which its properties or any thereof may be sold, or for the securities of a reorganized or recapitalized corporation. * * * If it shall become impossible to meet such expenses out of the income or profits of the Syndicate, the members agree to pay the same pro rata upon

call of the Manager, provided that the total amount of all such calls by the Manager upon any one member shall not exceed 10% of the amount of his subscription hereunder.

\* \* \* \* \* \* \*

\* \* \* It is also understood that in case the Manager participates in any underwriting or selling syndicate in connection with the marketing of the securities to be acquired by the Syndicate, or any thereof, it shall be entitled to receive a brokerage or commission on all securities marketed or sold by it, not exceeding 5% of the price at which such securities may be sold.

The instrument further provided that it should be accepted by executing one counterpart and delivering such executed counterpart to the manager, and that the other counterpart might be retained by the person thereby becoming a member; further that all of the counterparts executed by members and taken together should constitute the syndicate agreement as fully as though all parties had executed one agreement.

The deposit certificate received by a member from the Bank of California, National Association, in return for the money subscribed to the syndicate recited that it was nonnegotiable, but on the back thereof there is a printed form for assignment or transfer, together with a printed form for consent by the manager to the transfer.

The Coos Bay Lumber Co. paid from surplus a dividend for the quarter ended December 31, 1928, of $1.75 per share on all first preferred stock. Payment was made to the syndicate and on February 23, 1929, the manager enclosed to the members checks for their proportion thereof together with a balance sheet of the company under date of December 31, 1928.

The Coos Bay Lumber Co. paid from surplus a dividend for the quarter ended March 31, 1929, of $1.75 per share on first preferred stock. This was received by the syndicate and distributed by the manager.

The Coos Bay Lumber Co. purchased from the syndicate 15,939¼ shares of the first preferred stock, paying $100 and accrued dividend per share. The accrued dividend was applied by the manager against syndicate expenses and the principal sum received, amounting to 25 percent of the principal investment of the syndicate, was distributed by the manager on April 12, 1929, together with a financial statement of the company as of March 31, 1929.

On July 15, 1929, the manager distributed a dividend of $1.75 per share paid by the company for the quarter ended June 30, 1929, on the outstanding preferred stock. Accompanying this distribution was a letter from the president of the company giving results of the company for the first six months of 1929, its estimate of probable earnings for the year, and a balance sheet as of June 30, 1929.

On October 25, 1929, the manager distributed a dividend of $1.75 per share received from the company on the outstanding preferred stock, together with a balance sheet as of September 30, 1929. On February 14, 1930, a dividend from the company of $1.75 per share on the preferred stock was distributed by the manager of the syndicate, together with a letter from the president of the company, similar to the one distributed on July 15, 1929. Again on April 15, 1930, a dividend received from the company of $1.75 per share on preferred stock was distributed by the manager. On July 19, 1930, the manager distributed a letter with a copy of a letter from the president of the company, explaining why no dividend was being paid at that time. The balance sheet of the company as of June 30, 1930, was enclosed.

On February 11, 1931, the manager distributed a letter from the president of the company, together with a balance sheet and a comment upon the situation of the company, showing a net loss from the operations of the year 1930, and suggesting that some method must be found to provide the company with additional working capital. On August 6, 1931, a report was made by the manager, stating that the total amount of subscriptions and underwritings received for the proposed issue of notes and common stock of Coos Bay Lumber Co. was $728,690 on August 1, that $1,000,000 was the minimum amount the management would have felt justified in accepting, and, therefore, all subscriptions and underwritings received under the proposed financing were released.

On August 6, 1932, the manager distributed a notice that under the terms of the syndicate agreement the syndicate was to be terminated as of August 20, 1932. There was enclosed a complete statement of the company's affairs, together with a copy of the balance sheet of the company as of June 30, 1932. Attention was called to the depression and its effect in decreasing the company's working capital and prospective further diminution thereof. It was stated that the purposes of the syndicate had been defeated by the depression; that it was felt that members should be placed in the possession of their stock, in immediate relationship to the board of directors; that the management would, before dissolving the syndicate, donate to the syndicate the 15,939¼ shares of common stock of the company owned by it and retained by it at the time the syndicate was formed; that the manager would surrender to the company for cancellation the remaining outstanding shares of preferred stock, in simplification of the capital structure of the company; that this surrender would not decrease the proportionate participation of each member in the company, and that on or before August 20, 1932, there would be deposited with the Bank of California, National Association, as depositary for the syndicate, a certificate issued in the name of each

member for his number of shares of common stock in the company, delivery of which certificate would be made upon delivery by the member of the deposit certificate held by him, together with his copy of the syndicate agreement dated October 22, 1928, and upon payment by him of 20 cents per unit, representing syndicate expenses incurred.

The petitioners herein received their proportionate share of the distributions made by the syndicate manager both in cash and in stock. Upon the termination of the syndicate they received one share of common stock of the Coos Bay Lumber Co. for each share held by them.

Petitioner Harry E. MacConaughey received upon termination of the syndicate 90 shares of the common stock of the company, and on December 28, 1934, sold same for $217.40. Petitioners Joel W. Kaufmann and Mildred B. Kaufmann received 100 shares of said common stock and sold the same in 1936 for $1,096. The petitioners in filing their income tax returns deducted as a capital loss the difference between the sale price received and the adjusted cost basis of the units. In arriving at each deficiency, the respondent determined that the syndicate was an association taxable as a corporation, that the shares of the Coos Bay Lumber Co. stock sold were received in exchange for the units, upon which exchange gain or loss was realized, and that the cost basis of the stock sold was its fair market value on August 20, 1932, the date of distribution by the syndicate, which value respondent determined to be $3 per share. The respondent therefore as to petitioner Harry E. MacConaughey determined a loss of $52.60, with 60 percent thereof, or $31.56, recognizable. Petitioner MacConaughey had in his income tax return claimed a realized loss of $6,532.60, the difference between the sale price of $217.40 and an adjusted cost basis of $6,750. He therefore claimed a recognizable loss of 40 percent, or $2,613.04, and therefore claimed a capital loss of $2,000. As to the other petitioners, Joel W. and Mildred B. Kaufmann, his wife, respondent disallowed deduction of loss claimed and determined a realized gain of $796, of which 60 percent was determined to be taxable, one-half to each of the two petitioners. Petitioners Kaufmann and wife had claimed a realized loss of $6,424, the difference between the sale price of $1,096 and adjusted cost basis of $7,520, and claimed a deductible loss of 40 percent thereof, or $2,569.60, or $1,284.80 as to each.

The fair market value of common stock of the Coos Bay Lumber Co. on August 20, 1932, was $3 per share.

The only question requiring our determination is whether an organization was an association taxable as a corporation, as respondent contends, or a mere joint venture, pool or syndicate, as petitioners

argue. The question is not an easy one, for the organization possessed characteristics tending both to prove, and to deny, the existence of an association of the nature taxable as a corporation. No single test can be applied, as appears from the stress laid sometimes upon one feature, sometimes upon another, in the various cases. We should certainly give weight to the purpose for which the organization was formed, as set forth in the agreement under which it is set up, and to purpose and actual operation rather than form. *Commissioner* v. *Vandegrift Realty & Investment Co.*, 82 Fed. (2d) 387. The purpose here is plain. The corporate stock involved had previously been placed in a voting trust, with power in the voting trustees to sell the stock for the benefit of the beneficiaries (formerly holders of bonds of the company). The company already, at the time of formation of the "syndicate", had a contract to sell some of its nonoperating timber lands for $2,000,000, and received the purchase price thereof several months after the "syndicate" was organized. In this situation an investment banking house, after investigating the financial standing, business, and operations of the lumber company, conceived the idea that the remaining nonoperating timber lands could be sold, all second preferred stock and a substantial part of the first preferred stock could be retired, and 7 percent dividends paid on the remaining preferred, and that any unredeemed preferred stock, and the common stock, could be sold to sawmill operators in the southern states or otherwise disposed of. The investment bankers had a theory that such sawmill operators desired to commence operations in the West, because of depletion of timber in the South. Thus it appears that an initial idea, first of the voting trust and then of the investment bankers, was the sale to others of the stock of the lumber company. The investment bankers then contracted with the voting trust to purchase, and did purchase, for cash, all first preferred and common stock and immediately organized on October 22, 1928, what they called a "syndicate." Looking to the agreement entered into between the investment bankers and those who participated with them, we find again the idea of sale of stock predominating, for the agreement states its purpose:

* * * The purpose of this Syndicate is to acquire the stock above mentioned and to market or otherwise dispose of all or a part thereof. * * *

Respondent suggests that the words "or a part" allowed retention of all or a part by the "syndicate" manager. Viewing the expression in the light of the earlier history of the matter and intent of the investment bankers, we think that such expression does not militate against the prevailing idea of sale of stock. Obviously it might be necessary to sell only a part, at any one time, as it might not be possible to sell all the stock. There is no suggestion of power to purchase stock, though cases have held organizations both to buy and sell stock not to

be associations taxable as corporations. Later in the agreement exchange of securities is permitted, but this seems limited to exchange for securities of any other corporation with which there may be merger. We conclude that the object of the organization was not to do business generally, not trade generally even in the stock of the lumber company, but to dispose of such stock. Turning from purpose to activities, we see that in fact the activities of the organization consisted merely of receiving and distributing dividends upon the stock, selling to the lumber company a part of its first preferred stock, transmitting to the participants reports made by the company as to its operation and condition, and finally, when financial conditions changed, terminating the "syndicate" and distributing the stock. The respondent urges that the business of the lumber company was the business of the "syndicate." We can not so disregard the corporate entities. The organization took no integral part in the operation or conduct of the lumber company. Of course the "syndicate" was organized for profit, but we think it was not engaged in business within the intent of the cases suggesting conduct of business as a test.

Considering now the form of the organization, we of course note that there is centralized management in a broad sense, for there was a manager. *Morrissey* v. *Commissioner*, 296 U. S. 344. Yet there was no board of directors, no power of control by participants, no officers, no meetings of participants. There were no certificates of participation, a counterpart of the agreement and a deposit certificate, stating that it is nonnegotiable, being the only evidence of a participant's rights. There was no free assignability of rights. Though subject to hypothecation by a participant in borrowing money for his own use, any other transfer of a participant's interest was subject to the express written consent of the manager. It is true that the agreement bound and inured, except as otherwise provided, to the benefit of the members, "their heirs, executors and assigns", but as above seen, power to assign was specifically limited. The same expression in effect appeared in the syndicate agreement in *E. L. Cord*, 38 B. T. A. 1372, wherein we held a syndicate not to be taxable as a corporation. Liability of the participants was not limited as in a corporation. Liability for expenses was limited to 10 percent, but general liability was not so limited. Continuity of enterprise was limited by the power of the manager to terminate at any time, upon 10 days' notice, and by the fact that no provision was made for selection of a successor to the manager. Dissolution of Peirce, Fair & Co., the manager, would have terminated the syndicate so far as the terms of the agreement are concerned. The term of the agreement is of course much longer than those considered by us in *Pierre S. du Pont*, 37 B. T. A. 1198, and *John J. Raskob*, 37 B. T. A. 1283, where

we held there was no association taxable as a corporation, but otherwise there is considerable similarity. Title to the stock did not rest in the "syndicate" as such, though the manager could by express provision of the agreement hold it in its own name or in the name of others. The organization agreement provided no name for the group. It had no office, no books, no stationery, and no bylaws. The manager, Peirce, Fair & Co., kept records upon its own books as to the affairs of the syndicate, but designated no part of its office for syndicate transactions.

Reviewing all of the attributes of the organization here presented, it seems to us to partake of agency rather than of an association taxable as a corporation. The powers of the manager are expressly and irrevocably granted by the agreement: "The members irrevocably grant to the Manager full power and authority, for the account of the Syndicate, to do any and all acts", etc. The manager was given power to decide in its absolute discretion who should become members of the "syndicate." Its determination and apportionment of losses, profits, and expenses were conclusive. Such an agreement seems to us not to present the similarity to a corporate set-up which the cases require. To review and distinguish decisions would render little aid, for they, of course, vary in the facts presented. *Deputy* v. *du Pont*, 308 U. S. 488. We think that we have before us here an organization merely to dispose of certain stock, not even to buy or deal in it; or if not to dispose of all, merely to hold the remainder for the members, and distribute dividends or other distribution by the corporation, in a manner more similar to such cases as *E. L. Cord, supra; N. B. Whitcomb Coca-Cola Syndicate*, 35 B. T. A. 1031; affd., 95 Fed. (2d) 596; *W. S. Farish*, 36 B. T. A. 1114; and *Darol Trading Account*, 34 B. T. A. 837, involving holding of stock, rather than cases such as *Swanson* v. *Commissioner*, 296 U. S. 362, and *Helvering* v. *Coleman-Gilbert Associates*, 296 U. S. 369, where real property was owned and operated for long periods of time, or *Helvering* v. *Combs*, 296 U. S. 365, involving drilling of an oil well.

After analysis of the original intent of the organizers, the powers conferred by the agreement, and the activities conducted herein, we conclude and hold that petitioners did not own interests in an association taxable as a corporation, and therefore the distribution to petitioners upon termination thereof was not liquidation of such an association, and the basis for determination of gain or loss to them was the net investment made in the organization.

*Decision will be entered under Rule 50.*